IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FRANCES RYAN,

                              Plaintiff,                    OPINION AND ORDER

        v.
                                                           21-cv-592-wmc

HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY,

                              Defendant.

Plaintiff Frances Ryan challenges a decision by defendant Hartford Life and Accident Insurance Company to terminate her long-term disability benefits under the terms of her employer's disability insurance plan and ERISA § 502(a)(1)(B). 29 U.S.C. § 1132(a)(1)(B). Before the court are the parties' cross-motions for summary judgment. (Dkts. ##25, 28.) Plaintiff Ryan argues that the termination was arbitrary and capricious, while Hartford counters that it merely exercised appropriate discretion in denying her claim to long-term benefits. For the reasons explained below, the court will remand the case to Hartford for further review consistent with this opinion.

UNDISPUTED FACTS[1]

**A. Background**

Ryan was 56 years old at the time she filed her claim for long-term disability, having worked as an internal medicine physician for some 22 years, most recently for about 5 years at Associated Physicians. According to vocational specialist Keith Moglowsky (who

---

[1] Unless otherwise noted, the following undisputed facts are derived from the parties' submissions on summary judgment or the underlying evidence.

cited to the Department of Labor's "O*Net" database), an internal medicine physician was typically responsible for, among other things: (1) analyzing "records, reports, test results, or examination information to diagnose medical condition[s]," including "mak[ing] diagnoses when different illnesses occur together or in situations where the diagnosis may be obscure"; (2) treating various medical conditions; and (3) avoiding errors. (Dkt. #21-2 at 235.) Moglowsky further explained that Ryan's job required "complex abstract thinking," an understanding of "root causes and underlying principles," and hypothesis testing. (*Id.* at 236.)

Defendant Hartford is an insurance company that issued a group, long-term disability insurance policy to employees of Associated Physicians. The policy grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the policy. (Dkt. #21-6, at 225, 238.) Hartford is also responsible for paying any long-term disability benefits approved under that policy. (*Id.* at 238.) The policy defines "disabled" as the insured being "prevented from performing one or more of the Essential Duties of: (1) Your Occupation during the Elimination Period; *and* (2) Your Occupation *following* the Elimination Period." (Dkt. #21-11 at 194 (emphases added).)

## B. Ryan Injures Her Head and Hartford Approves Her Long-Term Disability Claim

In March 2018, Ryan fell and hit her head while vacationing on a cruise ship. Upon returning home, she continued to experience dizziness and fatigue, plus memory and concentration issues. A neurologist, Dr. Bradley Beinlich, concluded Ryan had suffered a

2

concussion.  In the months following her concussion diagnosis, Ryan began neurological rehabilitation and speech therapy.  Still, in July 2018, Ryan continued to report fatigue, mental fog, difficulty concentrating and balance issues, and she was diagnosed with post-concussion syndrome and migraine with aura.  In August, a psychiatrist, Dr. Richard Webb, examined Ryan, noting a primary diagnosis of alcohol dependence, but otherwise finding that she exhibited a normal memory, attention span and level of concentration.[2]

Also in August 2018, Ryan submitted a claim to Hartford for long-term disability, explaining that she had "[t]rouble with key components of [her] job.  Analysis, decision making, generating a test differential, however when I have to analyze etc.  I get dizzy and nauseated [and] have trouble thinking."  (Dkt. #21-11, at 116.)  In her attending physician statement, Dr. Magnolia Larson, a family medicine doctor, further explained that Ryan experienced "[d]isequilibrium, dizziness, nausea, poor concentration, [and] impaired decision making."  (*Id.* at 120.)

In September 2018, a neuropsychologist, Dr. Bruce Hermann, examined Ryan, noting that there was no evidence of "compromised rate of acquisition or retention of verbal or visual information," and that her executive functions ("problem solving, speeded mental flexibility, sustained attention/concentration, [and] general working memory") were intact.  (Dkt. #21-3, at 35.)  However, Dr. Hermann also noted that Ryan displayed mild or "low average" word finding difficulty and "subtle" verbal working memory weakness.  (*Id.*)

---

[2] Ryan does not argue that her alcohol dependence rendered her disabled.

3

Later in September, Hartford approved Ryan's long-term disability claim with a June 2018 benefit start date. In its approval letter, Hartford explained that Ryan's policy required her to apply for Social Security Disability ("SSDI") benefits. Ryan retained a law firm recommended by Hartford, and she later applied for SSDI benefits.

In a December 2018 phone interview with Hartford, Ryan again reported that her symptoms had not improved, despite regular, ongoing physical therapy, and that recent neuropsychological testing continued to show she suffered from issues with working memory and decision-making. By her January 2019 appointment with her regular physician, Dr. Larson, however, Ryan reported a "steady arc of improvement in cognitive processing" and that she generally slept well. (Dkt. #21-4, at 175.) The next month, Dr. Beinlich noted Ryan's report of headaches a few days per week, with some evolving into migraines, while treating "breakthrough" headaches with Tylenol or ibuprofen. (Dkt. #21-4, at 6-7.) Dr. Beinlich further noted that Ryan had issues with poor attention and concentration, working memory, multitasking, and fatigue. (*Id.* at 7.) During 2019, she also continued physical and massage therapy for migraines without marked improvement.

The Social Security Administration ("SSA") approved Ryan for SSDI benefits on July 31, 2019, prompting Hartford to request repayment of certain benefits the SSA would now cover, which Ryan did.

### C. Hartford Terminates Ryan's Benefits

On August 8, 2019, a Hartford claim examiner further advised Ryan that it was now "unclear if disability is supported at this time," noting that a "[medical case manager] review or possible independent review needed to determine if disability is [still] supported

for this claim." (Dkt. #21-1, at 165.)  One week later, Dr. Larson responded to Hartford's request for an update on Ryan's condition, stating that she continued to exhibit "marked limitation in directing and controlling activities, adjusting to frequent different tasks or changing techniques, and performance under stress or stressful situations" and that she "struggle[d] with making complex problem[-]solving decisions and staying on task until problems are resolved."  (Dkt. #21-7, at 55-57.)  In a phone interview with Hartford's nurse consultant, Ryan also reported ongoing fatigue, nausea, frequent headaches, some confusion and memory issues.

In December 2019, Dr. Beinlich noted that Ryan's headache control had been relatively good, as she estimated having one or two migraines per month and successfully treated her headaches with Tylenol or ibuprofen.  (Dkt. #21-2, at 208.)  He also noted that Ryan's dizziness and balance had improved, although her balance was not yet normal, as she still suffered an occasional fall.  (*Id.*)

On January 31, 2020, a neurologist, Dr. John Stratton, evaluated Ryan and found her predicted premorbid cognitive ability was "at least [in] the average range."  (Dkt. #21-2, at 253.)  However, Dr. Stratton also noted that her premorbid status was likely underrepresented, given her "observed" intellectual functioning and verbal comprehension in the "very superior range," with "superior" perceptual reasoning abilities.  (*Id.*)  He further noted that Ryan's "validity profile on a structured personality measure . . . raised concerns for inconsistent responding, overreporting of psychological dysfunction and cognitive/somatic complaints, and attempts to present herself as well [ ] adjusted."  (*Id.* at 253-54.)

Overall, Dr. Stratton found that Ryan was "doing quite well from a cognitive standpoint," and her cognitive status remained generally stable, noting that her "neuropsychological profile was intact and revealed numerous cognitive strengths." (*Id.* at 254.) Dr. Stratton noted Ryan's cognitive strengths included intellectual functioning, processing speed, and visual and verbal memory. (*Id.*) Although her response inhibition was below expectation, Dr. Stratton concluded that result was a "normal variation across a comprehensive neuropsychological battery." (*Id.*) He added that Ryan did not "evidence a coherent pattern of weaknesses that would raise concern for cognitive function." (*Id.*) In particular, while Dr. Stratton acknowledged that she had reported "cognitive difficulties" following her concussion, he found that she had only suffered limited concussion symptoms (*e.g.*, brief or no loss of consciousness), which suggested mild injuries unlikely to result in chronic neurological issues. (*Id.*) Finally, Dr. Stratton concluded that Ryan's ongoing cognitive concerns likely reflected, among other things, her reported depression, anxiety symptoms, migraines, and sleep fragmentation. (*Id.*)

In February 2020, a third-party vendor hired by Hartford arranged for Dr. Merle Orr, a physical medicine and rehabilitation specialist, to examine Ryan.[3] Shortly after doing so, Orr requested a copy of Dr. Stratton's report, but Hartford responded that it did

---

[3] Initially, Hartford requested that a neurologist examine Ryan, but the vendor did not have a neurologist within a 60-mile radius of her location.

not have the report.[4]  (Dkt. #21-1, at 35.)  Dr. Orr found that Ryan had no physical restrictions, although she was "still suffering from cognitive impairments and issues with anxiety."  (Dkt. #21-6, at 263.)  Even then, Dr. Orr found the evidence of cognitive impairment did not support sufficiently severe symptoms to limit work.  (*Id.*)  Orr added, however, that he would need to review the results of "any updated Neuropsychological testing for comparison['s] sake to see how much she has improved since the initial Neuropsychological testing done on September 7, 2018."  (*Id.* at 261.)  Moreover, although finding Ryan capable of returning to her internal medicine practice, Dr. Orr recommended limiting (at least initially) the numbers of patients she would see per day to avoid overstimulating her and the feeling of being rushed.  (*Id.* at 263-64.)

On March 18, 2020, Hartford next informed Ryan of its determination that she was no longer disabled under the terms of the policy and terminated her disability benefits.  In particular, Hartford explained that its medical case manager had reviewed all of the medical information and agreed with Dr. Orr's conclusion that she could perform the "Essential Duties" of an internal medicine physician as of March 18, 2020.  (Dkt. #21-2, at 26-27.)  Acknowledging that Ryan would continue receiving SSDI benefits, Hartford explained that "it is possible to qualify for SSD, but no longer continue to qualify for private long-term disability . . . benefits from The Hartford," because the standards governing public and private benefits differed in critical ways.  Thus, Hartford considered the SSA's disability

---

[4] The parties dispute whether Hartford asked Ryan for a copy of Dr. Stratton's report, but he had not prepared his report until February 14, 2020, the same day that Dr. Orr issued his report.  (Dkts. ##21-2, at 251; 21-6, at 255.)  Ryan fairly points out that Hartford did not consider Dr. Stratton's report in its initial decision to terminate her benefits, but it *did* consider his report in denying her appeal.  (Dkt. #21-2, at 5.)

determination as only one relevant piece of evidence.  (*Id.* at 25.)  In contrast, Hartford concluded that:

> The totality of the evidence does not substantiate severe observed or quantified cognitive symptoms and impairment in function sufficient to limit work activity.  However, you do have objective findings for anxiety.  While there are no specific restrictions required for your anxiety, nor any limitations on the amount of hours you can work, Dr. Orr recommends that you be allowed to have a reduced caseload upon your initial return to work.

(*Id.* at 26.)

### D. Appeal

Ryan submitted an appeal letter in March 2021, noting that she would mail 970 pages of evidence, including: (1) "Treatment records and opinion statements from Dr. Magdalena Larson"; (2) "neuropsychological evaluation and report by Dr. Stephen Rothke";[5] (3) "Vocational report by Keith Moglowsky"; and (4) "Updated clinical treatment records."  (Dkt. #21-4, at 78.)  Specifically, Ryan noted that Dr. Rothke had opined that she was limited in, among other activities, "[a]nalyz[ing] records, reports, test results, or examination information to diagnose medical condition of patients," and "[m]ak[ing] diagnoses when different illnesses occur together or in situations where the diagnosis may be obscure."  (Dkt. #21-4, at 71-72.)  Dr. Rothke added that Ryan's "ongoing post-concussion symptoms" would "compromise her endurance and are likely to reduce vigilance and lead to [ ] increased errors, compromising patient safety."  (*Id.*)

While the parties dispute the number of documents that Ryan actually submitted to Hartford, Appeal Specialist Paige Farrell avers that she had "personal knowledge of the

---

[5] Dr. Rothke was hired by a law firm that represented plaintiff.  (Dkt. #21-2, at 242.)

documents received by Hartford in connection with Ryan's request for administrative review, and of the documents compiled and contained in the claim file." (Farrell Aff. (dkt. #31) ¶ 3.) Farrell also avers that she "reviewed the documents received by Hartford via mail on March 8, 2021," and noticed several missing documents, including Stratton's and Rothke's neuropsychological evaluations, as well as Moglowsky's vocational evaluation and Ryan's post-December 2019 medical records. (*Id.* ¶¶ 6-7.)

After Farrell informed Ryan's attorney about the missing documents, the attorney sent Hartford Rothke's and Stratton's neuropsychological evaluations, as well as Moglowsky's vocational evaluation. (*Id.* ¶¶ 8-9, 11.) An employee at the firm representing Ryan further told Farrell that Hartford should continue its review of her claim, and that the firm would try to provide updated medical records. (*Id.* ¶ 10; Dkt. #21-2, at 221.)

### E. Additional Evidence on Administrative Appeal

In his January 2021 report, Dr. Rothke found Ryan's overall cognitive function to be "mostly intact," which was consistent with her estimated pre-injury abilities. (Dkt. #21-2, at 246.) However, Dr. Rothke noted that certain of Ryan's high scores may have been the result of a "practice effect," as she had already undergone two, similar neuropsychological evaluations before that of Dr. Rothke. (*Id.*) Dr. Rothke continued, "[a]lthough the findings are mostly of normal or better abilities, there was one finding of low average (and a present relative weakness in) complex abstract thinking, ability to understand root causes and underlying principles, and hypothesis testing," which he opined was consistent with Ryan's reported "difficulty 'putting things together' that she noted would interfere with medical decision making." (*Id.* at 246-47.) Based on the

limitations identified by Drs. Larson and Rothke, vocational expert Moglowsky also concluded that Ryan was no longer capable of practicing as an internal medicine doctor. (Dkt. #21-2, at 236.)

In response, Hartford hired yet another third-party service to evaluate the evidence in Ryan's case. On April 14, 2021, that service provided Hartford with the non-examining reports of Drs. Gabriel Jasso (neuropsychologist) and David Burke (neurologist). Dr. Jasso's report summarized Drs. Stratton's and Rothke's findings, explaining that their evaluations revealed "no frank impairment." (Dkt. #21-2 at 161-62.) He also explained that the evidence did not "show such significant and severe psychopathology as to require restrictions and limitations or that would reasonably impair cognitive functioning." (*Id.* at 162.) At the same time, Jasso acknowledged Dr. Rothke's finding that Ryan had "low average" complex abstract thinking, but opined that a "relative weakness does not equate with frank functional impairment, as there are no impaired scores that would indicate such significant cognitive impairment as to limit or preclude working." (*Id.* at 164.) Dr. Jasso also acknowledged that Dr. Larson had indicated Ryan was unable to work, but found no supporting evidence for that opinion, as well as no evidence showing that Ryan was "globally impaired [due to psychological or cognitive symptoms] from occupational functioning" from March 2020 to present. (*Id.* at 162, 164.)

As for Dr. Burke's report, "[g]iven that there are no measurable clinical findings showing any functional deficits of the claimant and given that there is a lack of most recent records showing the claimant's recent state," he opined that "no restrictions and/or limitations are supported." (*Id.* at 157.) He added that Ryan's medical records showed

10

that she suffered one or two migraine headaches per month, which was not frequent enough to support restrictions. (*Id.*) Finally, Dr. Burke was unable to identify any measurable findings supporting Dr. Larson's conclusion that Ryan was markedly limited in directing activities, performing tasks, changing techniques, and performing under stress. (*Id.* at 158.)

After completing their reviews, Drs. Burke and Jasso also conferred via telephone, concluding that they were unable to issue restrictions for Ryan. Hartford then sent their reports to Ryan for her review. In response, Ryan asked several follow-up questions, including seeking clarification as to the meaning of two phrases in their reports: "frank impairment" and "globally impaired from occupational functioning." (Dkt. #21-2, at 10.) Noting that Hartford Appeals Specialist Farrell apparently responded to Ryan's questions without further consulting Dr. Jasso, plaintiff argued in a letter to Hartford that, among other things, her right to a "full and fair" review had been violated. (*Id.* at 118.)

### F. Hartford Denies Ryan's Appeal

Regardless, on May 11, 2021, Hartford determined that the termination of benefits was appropriate, rejected Ryan's appeal, and concluded the claim would remain closed. In reaching this conclusion, Hartford purported to have considered all information in Ryan's claim file and summarized her medical history. In particular, Hartford noted Drs. Jasso and Burke had both assessed all medical documentation before concluding that her "lack of physical, cognitive or psychological restrictions and limitations" support finding Ryan capable of performing her essential job duties or functions. (*Id.* at 8.) While acknowledging once more that the Social Security Administration had approved Ryan for

Social Security disability benefits, Hartford again explained that different criteria applied to that determination versus the continuing validity of her claim to insurance benefits.

### G. Supplemental Documents

In this case, Ryan subsequently filed what is described as a "supplement to the administrative/claim file record" with additional reports from Drs. Rothke and Larson.[6] (Dkts. ##22, 22-1.)  First, in a November 16, 2020, "Post-Concussion Syndrome Medical Assessment Form," Dr. Larson explained that Ryan experienced: mental and physical fatigue; poor memory recall; word finding difficulty; dizziness; difficulty following conversations; trouble with complex decision making; and increased migraines.  (Dkt. #22-1, at 5.)  Dr. Larson also explained that Ryan would have to decide complex issues, use a computer for long periods, and regularly interact with others as an internal medicine physician.  She added that prolonged eye strain would worsen Ryan's concussive symptoms and precipitate additional migraines.  As a result, Dr. Larson concluded that Ryan could not "safely perform complex decision making," noting she suffered daily mental and physical fatigue and needed to rest between patients.  (*Id.* at 13.)

Second, in his January 27, 2021, "Medical Opinion Regarding Patient's Ability to Perform Cognitive Work-Related Activities," Dr. Rothke checked boxes indicating that Ryan was "seriously limited but not precluded" from: (1) "[a]nalyz[ing] records, reports, test results, or examination information to diagnose medical condition of patients"; and (2) "[m]ak[ing] diagnoses when different illnesses occur together or in situations where the

---

[6] Appeal Specialist Farrell attests that these documents "were not among the records scanned and received by Hartford on March 8, 2021."  (Farrell Aff. (dkt. #31) ¶ 15.)

diagnosis may be obscure." (*Id.* at 2.)  Dr. Rothke also opined that Ryan displayed a "reduced ability to integrate detailed, complex information necessary to formulate diagnoses and treatment plans, to conduct a differential diagnostic analysis, and to direct and supervise the work of other individuals," adding that her "ongoing post[-]concussion symptoms" compromised her endurance and were likely to lead to increased errors compromising patient safety.  (*Id.* at 2-3.)  Finally, he concluded that Ryan would likely miss more than four days of work per month.  (*Id.* at 3.)

## OPINION

ERISA authorizes a participant or beneficiary to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  ERISA § 502(a)(1)(B) (codified at 29 U.S.C. §1132(a)(1)(B)).  As to the denial of benefits under an insurance policy governed by ERISA, the court begins by determining the appropriate standard of review.  Generally, a denial of ERISA benefits must be reviewed under a *de novo* standard *unless* the plan has given the plan administrator or fiduciary discretionary authority to determine benefits or construe the terms of the plan.  *Williams v. Aetna Life Insurance Company*, 509 F.3d 317, 321 (7th Cir. 2007).

Here, the parties agree that the policy grants discretionary authority to defendant Hartford to make all benefits determinations, so the arbitrary and capricious standard of

13

review applies.[7]  (Pl. Br. (dkt. #27) 14.)  Under the arbitrary and capricious standard, the court "is not to decide whether it would reach the same decision as the administrator"; rather, the administrator's decision will be upheld "as long as specific reasons for the denial are communicated to the claimant and supported by record evidence." *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009) (citing *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006); *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 831 (7th Cir. 2009)).  Even so, the court will not uphold a plan administrator's decision "when there is an absence of reasoning in the record to support it." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (quotation marks omitted).

Moreover, in deciding whether a plan's decision to deny benefits is arbitrary and capricious, courts must consider any conflict of interest that exists when a plan has the *dual* role of deciding on eligibility for benefits *and* then paying out benefits, as is true for Hartford here. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009); *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 112 (2008).  Typically, a conflict of interest is weighed as a factor in a court's review of an ERISA benefits decision, acting as a "tiebreaker" in a close case. *Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 440 (7th Cir. 2019).  However, these conflicts "carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy." *Raybourne*, 700 F.3d at 1082.

---

[7] Because the court applies the arbitrary and capricious standard, it need not address defendant's argument that it is entitled to judgment applying the *de novo* standard under Fed. R. Civ. P. 52(a). (Dkt. #30, at 8.)  *See Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 303 (7th Cir. 2020) (applying Rule 52(a) when district court reviewed the administrative record *de novo*).

Specifically, a court should consider "the reasonableness of the procedures by which the plan administrator decided the claim [and] any safeguards the plan administrator has erected to minimize the conflict of interest." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).

## I.  Scope of the Record

As already alluded to above, the parties dispute the scope of the relevant evidentiary record.  Representing that she submitted the documents to Hartford during the appeal process, plaintiff argues that the court should consider (1) Dr. Larson's "Post-Concussion Syndrome Medical Assessment Form," and (2) Dr. Rothke's "Medical Opinion Regarding Patient's Ability to Perform Cognitive Work-Related Activities."  However, defendant did not include them in its certified claim file, asserting that *plaintiff* neglected to send either document.

Typically, courts only consider evidence that was before the administrator when it made its decision.  *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001).  Even if a document was not actually in front of the claims examiner, however, a court may consider it when the examiner should have been aware of its existence.  *Id.* at 462-63.  For example, in *Hess*, the Seventh Circuit determined that the claims examiner should have known about a document's existence when Hess's attorney "made explicit reference" to the document and "even quoted the relevant portions."  Thus, the court concluded that it was "properly a part of the administrative record."  *Id.* at 463.

While the parties dispute whether plaintiff actually sent defendant the supplemental opinions of Drs. Rothke and Larson, it appears that defendant should have

been aware of Dr. Rothke's "Medical Opinion," because as in *Hess*, plaintiff quoted from that opinion in her appeal letter (albeit without referring to it by title). (Dkt. #21-4, at 71-72.) It is less obvious that defendant was on notice of Dr. Larson's updated assessment because plaintiff did not cite it in her appeal letter, much less quote from it. Accordingly, the court will consider Dr. Rothke's supplemental opinion but not Dr. Larson's.[8]

## II. Vocational Analysis and Medical Evidence

Plaintiff primarily argues that defendant's decision was arbitrary and capricious because it did not discuss the "Essential Duties" of her work as a physician, while defendant contends that, having reasonably concluded plaintiff was no longer cognitively impaired and had no ongoing restrictions on her work, she necessarily could perform these essential duties. In fairness to plaintiff, defendant's insurance policy defined "disabled" as being "prevented from performing one or more of the *Essential Duties*" of "Your Occupation,"

---

[8] The court need not *definitively* resolve whether either document is properly part of the administrative record because, as explained below, defendant's denial of continued coverage appears to have relied upon medical opinions that failed to consider plaintiff's current cognitive limitations in the specific context of her work as a physician. Further, to the extent plaintiff argues that defendant's failure to consider the supplemental opinions suggests defendant's decision was arbitrary and capricious, defendant did not throw Ryan's supplemental application in the trash instead of evaluating it on the merits. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999). To the contrary, after receiving plaintiff's appeal letter, defendant notified plaintiff that it had not received some of the promised materials, including updated, post-December 2019 medical records, which presumably would have included the November 16, 2020, and January 27, 2021, forms from Drs. Larson and Rothke, respectively. (Farrell Aff. (dkt. #31) ¶¶ 6-8.) And, instead of providing updated medical records, plaintiff apparently responded with updated vocational and neuropsychological evaluations, telling Appeal Specialist Farrell to continue with Hartford's review. (*Id.* ¶ 10.) Accordingly, defendant's failure to consider those two forms does not support finding that Hartford acted arbitrarily and capriciously after having followed-up with plaintiff to ensure that it had all the relevant documents. *See Hess*, 274 F.3d at 463 ("the fact that an administrator *blatantly disregards* an applicant's submissions can be evidence of arbitrary and capricious action") (emphasis added).

(dkt. #21-11, at 194 (emphasis added)), and defendant did not specifically analyze an internal medicine physician's obviously demanding job duties in terminating her disability benefits.

In support of this argument, plaintiff mainly relies on out-of-circuit, non-binding case law, suggesting that an insurer *must* consider the essential duties of a claimant's position before denying benefits. *E.g.*, *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381 (1st Cir. 2015) ("under an own occupation standard, medical evidence is only part of the equation . . . a decisionmaker must be aware of, and apply, the requirements of the occupation").[9] Although plaintiff has not pointed to binding case law that defendant had to address plaintiff's "Essential Duties," it does raise a question as to whether defendant's conclusion that plaintiff *no longer* had any cognitive limitations is supported by the record before it.

In response, defendant asserts that it did not have to consider plaintiff's job duties because it reasonably concluded that she had *no* cognitive limitations. *See Jacowski v. Kraft Heinz Foods Co.*, No. 15-CV-657-BBC, 2016 WL 6693588, at *19 (W.D. Wis. Nov. 14, 2016) ("because Aetna made a reasoned determination that plaintiff's medical condition did not cause her any work limitation, it had [n]o need to consider the requirements of any particular job"). However, Jacowski was a customer service supervisor. *Id.* at *2.

---

[9] Plaintiff also cites to a U.S. Supreme Court case and Seventh Circuit case as additional support, but those cases do not consider whether the plan administrator *must* address the essential duties of a claimant's job; rather, they state that a plan administrator must consider a claimant's evidence. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence"); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009) (plan administrators "must address any reliable, contrary evidence presented by the claimant").

While undoubtedly a demanding position, that position is also not as cognitively demanding as that of an internal medicine physician.  Given the particular demands of plaintiff's past work, the question for Hartford under the terms of its own policy was not whether she has rebounded to a *norm* of cognitive ability in the population as a whole, but to a norm of her past abilities or at least to those sufficient to meet the essential duties of a typical internal medicine physician.

Here, medical experts presented conflicting opinions as to whether plaintiff remained psychologically impaired.  Generally, deciding which conflicting opinions to credit is left to the insurer's discretion, and this court will not second guess a choice between conflicting medical opinions under an arbitrary and capricious standard.  *See Semien v. Life Insurance Co. of North America*, 436 F.3d 805, 812 (7th Cir. 2006) (courts will not "attempt to make a determination between competing expert opinions").  Rather, "an insurer's decision prevails if it has rational support in the record."  *Id.* (quotation marks omitted).  Although this is certainly a close case given the conflicting medical opinions, it nevertheless must be remanded because *none* of the opinions that defendant relies upon considered plaintiff's cognitive limitations in the context of her past performance as an internal medicine physician (or even that of a "normal" physician).

In particular, plaintiff emphasizes Dr. Rothke's January 2021 finding that she had "low average (and a present relative weakness in) complex abstract thinking, ability to understand root causes and underlying principles, and hypothesis testing."  (Dkt. #21-2, at 246-47.)  Dr. Rothke further opined that these limitations were consistent with plaintiff's reported, continued difficulty "putting things together" (*id.*), which he later

explained could well interfere with her medical decision-making by diminishing her ability to diagnose medical conditions using differential diagnosis analysis, develop treatment plans and supervise others.  (Dkt. #22-1, at 2.)

However, other evidence suggests that plaintiff had no remaining cognitive impairment.  Even Dr. Rothke concluded that plaintiff's cognitive function was "mostly intact," consistent with her pre-injury abilities, and with "mostly [ ] normal or better abilities."  (Dkt. #21-2, at 246.)  Moreover, in January 2020, Dr. Stratton, who appears to have been unaffiliated with either party,[10] found that plaintiff was "doing quite well from a cognitive standpoint."  (*Id.* at 254.)  He noted that plaintiff "exhibited numerous cognitive strengths," including her performance on measures of intellectual functioning, process speed, and strong visual and verbal memory as well as her "significantly above average ability to encode, recall, and recognize both visual and verbal information."  (*Id.*)  Still, somewhat contrary to his bottom-line conclusion that plaintiff was doing well cognitively, Dr. Stratton further explained that migraines, sleep disturbances, anxiety, or preoccupation with poor health could explain her cognitive impairment.  (*Id.* at 254.)  Even recognizing plaintiff's diminished response inhibition, Dr. Stratton concluded that result was still within normal variation in a comprehensive neuropsychological battery.[11]  (*Id.*)  Mere months after her injury, a psychiatrist, Dr. Webb, also noted that plaintiff had

---

[10] Dr. Stratton's notes indicate that his evaluation was intended for the purpose of informing future treatment and was *not* intended for so-called "medical-legal purposes."  (Dkt. #21-2, at 252.)  Nor does plaintiff suggest that Dr. Stratton was somehow associated with defendant Hartford.

[11] Drs. Stratton and Orr acknowledged that plaintiff suffered from anxiety, but she does not argue that her anxiety prevented her from working as a physician.

normal memory, attention span and concentration, and a neuropsychologist, Dr. Hermann, concluded that, although plaintiff had mild or "low average" word finding difficulty and "subtle" verbal working memory weakness, her executive functions were otherwise intact.  (Dkt. #21-3, at 35.)

Faced with this conflicting evidence, defendant then engaged a third-party service to retain Drs. Jasso and Burke to review plaintiff's medical records.  Dr. Jasso acknowledged Dr. Rothke's finding that plaintiff's complex, abstract thinking was "low average," but concluded that a relative weakness did not amount to a "frank" (or clinically evident) functional impairment and concluded that she was not "globally" (or broadly) impaired from occupational functioning.[12]  (Dkt. #21-2, at 162-64.)  Further, Dr. Burke opined that no measurable clinical findings supported that plaintiff had any remaining functional deficits.

In the typical case, the court would not second guess such conflicting evidence -- especially when plaintiff apparently exhibited many cognitive strengths that were at least largely consistent with her pre-injury abilities.  However, this case is atypical because of plaintiff's unusually demanding occupation and the shortage of medical opinions relied upon by Hartford specifically addressing her post-injury, cognitive limitations in the context of her past performance as an internal medicine physician.  To be sure, Dr. Orr considered plaintiff's work as a physician and concluded that she could return to practice, but he still recommended initially limiting the number of patients she saw, which suggests

---

[12] *Frank*, Merriam-Webster (https://www.merriam-webster.com/dictionary/frank#medicalDictionary); *Global*, Merriam-Webster (https://www.merriam-webster.com/dictionary/global).

that she might not have been able to work at her previous pace or even a "normal" physician's pace. (Dkt. #21-6, at 263.)

Arguably, the most relevant evidence of plaintiff's ability to resume her internal medicine practice is Dr. Rothke's January 2021 "Medical Opinion Regarding Patient's Ability to Perform Cognitive Work-Related Activities."  Most concerning is Dr. Rothke's opinion that plaintiff's reduced cognitive abilities would decrease her endurance, which is consistent with Dr. Orr's recommendation that she initially limit the number of patients that she saw, and likely result in an increased error rate, compromising patient safety. (Dkt. #22-1, at 2-3.)  In fairness to defendant, Dr. Rothke's supplemental opinion is not based on additional, neuropsychological testing that originally suggested plaintiff was cognitively impaired.  Still, defendant did not consider this relevant evidence in upholding its termination of benefits, despite being on notice of it.  This, too, supports remand.

Given the general lack of opinions considering whether plaintiff was cognitively impaired in the context of her past performance as a physician or in comparison to other physicians, the court will remand the case to defendant for further consideration.

## III. Social Security Award

Finally, plaintiff also argues that defendant failed to consider adequately her SSDI award in terminating her disability claim.  While "instructive," the Seventh Circuit has repeatedly held that the social security administration's determination of disability is not binding on a plan administrator.  *E.g.*, *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007).  Certainly, a plan's failure to *consider* the SSA's determination in making its own

benefit decisions can suggest arbitrary decision making and justify the court giving more weight to a structural conflict of interest. *Holmstrom*, 615 F.3d at 772-73. Moreover, this concern is *heightened* where, as here, the plan required the claimant to apply for Social Security benefits, and the SSA decision was made under a "more stringent disability definition." *Id.*

In its letter denying plaintiff's appeal, defendant acknowledged the SSA award but explained that different criteria applied in determining the continued validity of her claim to insurance benefits. However, defendant's reason for discounting plaintiff's receipt of SSDI benefits is not particularly persuasive. To the contrary, the SSA narrowly defines "disability" as an "inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A) (emphasis added). The SSA standard is generally "more stringent than [a private] plan's 'any occupation' disability definition," in that the SSA standard requires an inability "to engage in any substantial gainful activity" altogether. *Holmstrom*, 615 F.3d at 763 n.4; 42 U.S.C. § 423(d)(1)(A). That is especially true here where defendant's policy requires that plaintiff be able to return to her past occupation as an internal medicine physician as opposed to being able to engage in "any substantial gainful activity," which presumably includes jobs significantly less demanding than an internal medicine physician. So, instead of justifying defendant's termination of benefits, the grant of SSA benefits would, if anything, *support* concluding that plaintiff could *not* return to work as an internal medicine physician.

22

Before this court, defendant offers an additional reason for distinguishing the SSA award by pointing out that it considered evidence that was not in front of the SSA in determining plaintiff was eligible for benefits in 2019, including Drs. Stratton's and Rothke's neuropsychological evaluations, as well as Drs. Jasso's and Burke's medical opinions. *Cf. Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (on review, a plan is "not limited to repeating what [it] told the applicant"). As discussed, however, those opinions are arguably flawed because they did not consider plaintiff's demanding occupation in determining whether she was cognitively impaired.

The court gives less weight to defendant's structural conflict given its dual role of determining benefit eligibility *and* paying any long-term disability benefits because defendant minimized that conflict by contracting with third-party agencies, who referred plaintiff's case to three independent experts. *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 673 (7th Cir. 2018). Still, this conflict, plus plaintiff's SSA award, further supports remanding this case to defendant Hartford. On remand, defendant should be sure to consider plaintiff's present cognitive abilities in light of her past-performance or that of a "normal" doctor in her field. Ideally, Hartford would allow the physicians with conflicting opinions (Drs. Rothke, Stratton, Orr, Jasso, and Burke) to jointly choose a third-party expert to make that evaluation to avoid any appearance of a conflict. Absent such a straightforward opinion, however, this court will remand the case for further consideration by Hartford. *See Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 447 (7th Cir. 2019) ("The most common remedy when an ERISA plan administrator's benefits decision is deemed arbitrary is to remand the matter for a fresh administrative decision.").

ORDER

IT IS ORDERED that:

1) Plaintiff Frances Ryan's motion for summary judgment (dkt. #25) is GRANTED in part and DENIED in part, and the case is REMANDED to Hartford for further review consistent with this opinion.

2) Defendant Hartford Life and Accident Insurance Company's motion for summary judgment (dkt. #28) is DENIED.

3) The clerk of court is directed to enter judgment and close the case.

Entered this 18th day of June, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge